# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARCUS WHITE,** | **CIVIL ACTION** |
| **Plaintiff** | |
| | |
| **VERSUS** | **NO. 15-1384** |
| | |
| **ROUSES ENTERPRISES, LLC,** | **SECTION: "E"(3)** |
| **Defendant** | |

## ORDER AND REASONS

Before the Court is a motion for summary judgment filed by Defendant Rouses Enterprises, LLC.[1] The motion is opposed.[2] For the reasons that follow, the motion for summary judgment is **GRANTED**.

## FACTUAL & PROCEDURAL BACKGROUND

Rouses Enterprises, LLC ("Rouses"), operates a chain of grocery stores across Louisiana, including the store located at 2701 Airline Drive in Metairie, Louisiana—Store 27.[3] Plaintiff Marcus White was employed by Rouses at Store 27 as a "meat cutter," or butcher, beginning on April 23, 2012, until his termination on September 15, 2014.[4] The store director of Store 27 is currently, and was at all relevant times, an individual named Edward W. Drevar.[5] Drevar admittedly is homosexual.[6] According to Plaintiff, on September 11, 2014, Drevar "sexually propositioned" him in the employee's bathroom, implying that Plaintiff would not receive a pay raise unless he "submit[ted]" to "Drevar's sexual advances."[7] Plaintiff refused Drevar's advances.[8] Plaintiff was then suspended

---

[1] R. Doc. 13.
[2] R. Doc. 15.
[3] R. Doc. 13-1 at 1, ¶1; R. Doc. 15-1 at 1.
[4] R. Doc. 13-1 at 2, ¶7; R. Doc. 15-1 at 1.
[5] R. Doc. 13-1 at 2, ¶5; R. Doc. 15-1 at 1.
[6] R. Doc. 15 at 1; R. Doc. 15-3 at 22 (Deposition of Edward Drevar).
[7] R. Doc. 15-1 at 2.
[8] R. Doc. 15 at 1–2; R. Doc. 15-1 at 1.

from work on September 12, 2014, and his employment ultimately was terminated on September 15, 2014.[9] Plaintiff contends he was suspended and eventually terminated because he refused Drevar's sexual propositions, while Rouses maintains the true cause of its termination of the Plaintiff was a "lack of confidence" stemming from the Plaintiff's alleged theft of groceries.[10] Plaintiff filed suit against Rouses on April 28, 2015, for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964.[11] On February 17, 2016, Rouses filed a motion for summary judgment, seeking the dismissal of Plaintiff's claims in their entirety.[12] Rouses contends, based on the undisputed material facts, that Plaintiff cannot carry his burden of proof to establish the necessary elements of Title VII sexual harassment and retaliation claims.

According to Plaintiff, at some point during his shift on September 11, 2014,[13] he took a break from work and "had the occasion to visit the men's room to relieve himself."[14] While in the restroom, Plaintiff contends Drevar, too, entered the restroom and began to use the stand-up urinal while Plaintiff occupied a stall.[15] Plaintiff then exited the stall, proceeded to the sink to wash his hands, and upon looking in the mirror above the sink, observed Drevar using the stand-up urinal with his back to where the Plaintiff was standing.[16] What happened next serves as the foundation of Plaintiff's claims in this action. Plaintiff testified in his deposition that Drevar, while using the urinal and facing

---

[9] R. Doc. 13-1 at 5, ¶¶33, 34; R. Doc. 15-1 at 1.
[10] R. Doc. 13-2 at 2–4.
[11] *See generally* R. Doc. 1.
[12] R. Doc. 13.
[13] In administrative proceedings before the EEOC, Plaintiff alleged the incident occurred on September 10, 2014. *See* R. Doc. 13-2 at 4–5. After being presented with evidence that he and Drevar were not at work together on September 10, 2014, Plaintiff apparently changed his position and maintained the incident instead happened on September 11, 2014. *See* R. Doc. 13-2 at 5. Whether the incident occurred on September 10th or September 11th is, for the reasons stated herein, immaterial to the Court's ruling.
[14] R. Doc. 1 at 2; R. Doc. 15 at 1–2.
[15] R. Doc. 1 at 2.
[16] R. Doc. 15-2 at 6–7 (Deposition of Marcus White).

away from the Plaintiff, commented: "So, how bad you want that raise?"[17] Plaintiff further testified at his deposition as follows:

> [A]t that instance, I just raised my head up, and I looked in the mirror, and all I could see was Mr. Ed with his pants down looking back at me with, like, a very sadistic look on his face, you know, and I actually looked to make sure that I wasn't – my mind wasn't playing tricks on me, and in fact, you know I saw him with his pants down and his ass exposed and looking back at me as, I don't know, like a horror movie or something. . . . [I]t took me off balance, and at that point, I got very angry, very angry, and . . . I told Mr. Ed, I said, "I didn't know I had to do sexual favors in order to get a raise that's rightfully mine," . . . and I stormed out the bathroom. I left.[18]

Rouses disputes whether Drevar "sexually propositioned" Plaintiff, arguing there is absolutely no evidence to support Plaintiff's allegations.[19] Plaintiff alleges, for example, that in addition to making the aforementioned comment, Drevar "disrobed" and told Plaintiff that "if he wanted a promotion and raise, he would have to submit to Drevar's sexual advances."[20] Rouses contends there is no evidence that Drevar "disrobed" or that Drevar specifically told Plaintiff he would have to "submit" to his "sexual advances."[21] Irrespective of whether the encounter occurred, the parties agree that at no point thereafter did Plaintiff report the incident to any of his superiors at Rouses, nor did he mention the incident to his co-workers.[22] In fact, Plaintiff notes he never "report[ed] the events of September 11, 2014 to anyone at Rouses because he felt that he was in an emotional ball and was cornered and embarrassed over what happened to him."[23] Plaintiff argues it was his encounter with Drevar and his rebuffing of Drevar's "sexual advances" which led to his being suspended, and ultimately terminated, days later.

---

[17] R. Doc. 15-2 at 5 (Deposition of Marcus White). *See also* R. Doc. 19 at 1.
[18] R. Doc. 15-2 at 5–6 (Deposition of Marcus White).
[19] *See generally* R. Doc. 19.
[20] R. Doc. 15 at 1–2.
[21] R. Doc. 19 at 1–2.
[22] R. Doc. 15-1 at 2, ¶7.
[23] R. Doc. 15-1 at 2, ¶7.

Rouses also disputes that Plaintiff's suspension and termination stemmed from a restroom-encounter with Drevar, citing a theft allegedly committed by Plaintiff as the true reason he was fired. In support, Rouses offers declarations executed by several Rouses's employees, including Drevar, under the penalty of perjury.[24] One such declaration was executed by Wade Guidroz, the assistant store director of Store 27.[25] In his declaration, Guidroz states that, on September 11, 2014, he was notified that "a shopping cart with bagged groceries was in the meat cooler in the back of the store."[26] Guidroz went to the meat cooler and confirmed that a shopping cart, loaded with bagged groceries, had been placed in the cooler.[27] Guidroz noted "[t]here was no receipt or any other identifiable information with the shopping cart."[28] According to Guidroz, he was "advised that it was Marcus White that had put the shopping cart containing the bagged groceries in the meat cooler."[29] Guidroz then reported the situation to Drevar.[30] Aware Plaintiff's shift was soon ending, Drevar and Guidroz stationed themselves "at the front of the store and alerted the sheriff's office deputy who was working a detail in the store, Officer Todd Vignes, that he should be on the alert for Marcus White attempting to leave the store with a grocery cart containing bagged groceries."[31] In his declaration, Drevar states that, while surveilling the front of the store, he asked Guidroz to check the meat cooler to see if the cart and bagged groceries were still there.[32] After checking the cooler, Guidroz "found that the shopping

---

[24] R. Doc. 13-4 (Declaration of Edward W. Drevar); R. Doc. 13-5 (Declaration of Wade M. Guidroz); R. Doc. 13-6 (Declaration of Patricia Velez). *See also* R. Doc. 13-3 (Deposition of Edward W. Drevar).
[25] R. Doc. 13-5 (Declaration of Wade M. Guidroz).
[26] R. Doc. 13-5 at 3, ¶3 (Declaration of Wade M. Guidroz); R. Doc. 13-2 at 2.
[27] R. Doc. 13-5 at 3, ¶4 (Declaration of Wade M. Guidroz); R. Doc. 13-2 at 2.
[28] R. Doc. 13-5 at 3, ¶4 (Declaration of Wade M. Guidroz); R. Doc. 13-2 at 2.
[29] R. Doc. 13-5 at 3, ¶7 (Declaration of Wade M. Guidroz); R. Doc. 13-2 at 2.
[30] R. Doc. 13-5 at 3, ¶3 (Declaration of Wade M. Guidroz); R. Doc. 13-2 at 2.
[31] R. Doc. 13-5 at 3, ¶9 (Declaration of Wade M. Guidroz); R. Doc. 13-2 at 2.
[32] R. Doc. 13-4 at 5, ¶17 (Declaration of Edward W. Drevar).

cart and bagged groceries had disappeared" and reported that finding to Drevar.[33] According to Guidroz, he and Drevar then "split up" and "walked through the entire store trying to find the bagged groceries in the shopping cart and trying to locate Marcus White."[34] The search turned up neither White nor the cart and bagged groceries.[35] Guidroz further stated:

> Our search of the store took between 15 and 20 minutes. After our search, I was present when Mr. Drevar began speaking with the cashiers at the front of the store to ask them if any of them had checked Mr. White out with a cart of groceries. None of the cashiers who were spoken to said that they had checked Mr. White out with any groceries that evening.[36]

Drevar's declaration is on all fours with the version of events to which Guidroz attested. According to Drevar, he was notified on September 11, 2014, by his assistant store director, Wade Guidroz, "that a shopping cart had been discovered in the meat cooler containing a large quantity of meat and seafood that had been bagged in the same bags that are used by the front end cashiers when checking out customers."[37] Drevar noted there was "no note or receipt with the merchandise to indicate that it had been purchased or that it belonged to a customer."[38] Drevar explained he immediately became suspicious, as he previously "caught an employee attempting to steal company merchandise by placing it in bags as if it had been purchased and then leaving it in the meat cooler."[39] Drevar testified in his deposition that it was "quite apparent" after investigating the situation and speaking with his employees, including Guidroz, that

---

[33] R. Doc. 13-5 at 3, ¶10 (Declaration of Wade M. Guidroz); R. Doc. 13-2 at 2.
[34] R. Doc. 13-5 at 4, ¶11 (Declaration of Wade M. Guidroz).
[35] R. Doc. 13-4 at 5, ¶18 (Declaration of Edward W. Drevar); R. Doc. 13-2 at 3.
[36] R. Doc. 13-5 at 4, ¶13 (Declaration of Wade M. Guidroz).
[37] R. Doc. 13-4 at 3, ¶¶5, 8 (Declaration of Edward W. Drevar); R. Doc. 13-5 at 3, ¶7 (Declaration of Wade M. Guidroz).
[38] R. Doc. 13-4 at 3, ¶5 (Declaration of Edward W. Drevar).
[39] R. Doc. 13-4 at 3, ¶6 (Declaration of Edward W. Drevar).

Plaintiff was responsible.[40] Moreover, Drevar explained that he suspected Plaintiff was involved, because Plaintiff "worked in the meat department and had access to the meat cooler where the shopping cart . . . was located."[41] Further, Drevar explained, were Plaintiff not involved, Drevar would have expected Plaintiff to report "the fact that the shopping cart containing bagged groceries was in the meat cooler, where it did not belong."[42] According to Drevar, after consulting with Guidroz, he asked Officer Todd Vignes, the Jefferson Parish Sheriff's Office deputy working a detail at the store, to be on the lookout for an employee leaving the store with a cart containing bagged groceries.[43] Drevar contends he and Guidroz also watched the store's main exit.[44] While observing the front of the store, Drevar allegedly saw the Plaintiff clock out, at approximately 6:46 p.m., and exit the store *without* a shopping cart or bagged groceries.[45] Drevar maintains he then asked Guidroz to check the meat cooler to determine if the cart and groceries were still there, and after doing so, Guidroz reported that the cart and groceries were no longer in the cooler.[46] Drevar noted that he and Guidroz then spent approximately 15 to 20 minutes searching the store for the shopping cart to no avail.[47]

After speaking with other employees about the situation, Drevar and Guidroz returned to the front of the store and asked Officer Vignes if he observed any employees leaving the store with bagged groceries.[48] Officer Vignes responded in the negative.[49]

---

[40] R. Doc. 13-3 at 14 (Deposition of Edward W. Drevar).
[41] R. Doc. 13-4 at 4, ¶11 (Declaration of Edward W. Drevar).
[42] R. Doc. 13-4 at 4, ¶11 (Declaration of Edward W. Drevar).
[43] R. Doc. 13-4 at 4, ¶14 (Declaration of Edward W. Drevar).
[44] R. Doc. 13-4 at 5, ¶15 (Declaration of Edward W. Drevar).
[45] R. Doc. 13-4 at 5, ¶17 (Declaration of Edward W. Drevar).
[46] R. Doc. 13-4 at 5, ¶17 (Declaration of Edward W. Drevar). *See also* R. Doc. 13-5 at 3, ¶10 (Declaration of Wade M. Guidroz).
[47] R. Doc. 13-4 at 5, ¶18 (Declaration of Edward W. Drevar).
[48] R. Doc. 13-4 at 6, ¶20 (Declaration of Edward W. Drevar).
[49] R. Doc. 13-4 at 6, ¶20 (Declaration of Edward W. Drevar).

However, while near the customer-service counter at the front of the store, Drevar avers he was approached by Patricia Velez, the store's bookkeeper. Velez executed a declaration stating that she told Drevar she had just seen Marcus White leave the store with a basket full of bagged groceries.[50] Velez's declaration explains, in detail, what she observed on September 11, 2014:

> On the afternoon of September 11, 2014, I saw Mr. White with a grocery cart containing bagged groceries coming from Aisle 1 or 2 directly toward me at the customer service counter. As he approached the counter, he took the main aisle parallel to the counter of the customer service desk immediately in front of me, making a right turn with the basket with bagged groceries in it. As he passed me with the grocery cart, he said to me, "Goodbye, Ms. Patricia." I responded by telling him "Goodbye."
>
> As I saw Mr. White walk past me with the grocery cart containing bagged groceries, I thought to myself that it was odd that he was coming not from the cashier area of the store but from the aisles of the store where food is displayed with a grocery cart already containing bagged groceries. I was thinking that in order for him to have bagged groceries he should be coming from the area of the store where the cash registers were located, but he had not.[51]

Velez further explained it was store policy that employees wishing to purchase items were required to check out at "the customer service counter or the first register that is open, beginning with Register No. 1," and "[i]f another register is used, a member of management must be present while the employee is checking out."[52] Drevar confirmed the existence of such a policy and that it was in effect on September 11, 2014.[53] Velez, who was working the customer service counter on September 11th, noted the Plaintiff did not check out with her prior to leaving the store.[54] And, according to Drevar, he spoke with

---

[50] R. Doc. 13-6 (Declaration of Patricia Velez).
[51] R. Doc. 13-6 at 3, ¶¶6, 7 (Declaration of Patricia Velez).
[52] R. Doc. 13-6 at 4, ¶11 (Declaration of Patricia Velez).
[53] R. Doc. 13-4 at 6, ¶23 (Declaration of Edward W. Drevar).
[54] R. Doc. 13-6 at 4, ¶12 (Declaration of Patricia Velez).

the cashiers on duty at the time Plaintiff left the store, all of whom confirmed they did not check out the Plaintiff at their registers.[55]

According to Drevar, after speaking with Velez as well as the other cashiers, he called Lloyd Songy, the district manager for Rouses, to "relate[] to Mr. Songy what had just occurred in the store regarding Marcus White and the bagged groceries that he had taken from the store without paying for them."[56] Drevar also called and emailed Randall Howard, the head of security for Rouses Supermarkets, to report the events of September 11th and to seek guidance on how to proceed.[57] Howard responded to Drevar's email, directing Drevar to "wait for Mr. White to report to work the following day and to then suspend him at that time pending further investigation."[58] When Plaintiff arrived at work on Friday, September 12th, Drevar asked the Plaintiff to accompany him to his office in the store.[59] Once in the office, with only Plaintiff and Drevar present, Drevar told Plaintiff he was being suspended "pending investigation."[60] As Drevar was instructed by Howard not to divulge the reason for the suspension, Drevar informed Plaintiff he was "not at liberty to say" why Plaintiff was being suspended.[61] Drevar notes in his declaration that, during their conversation, the Plaintiff continued to "press[]" him for the reason Plaintiff was being suspended but at no point did Plaintiff "accuse [Drevar] of having engaged in any inappropriate behavior either that week or at any time before."[62] Drevar then escorted Plaintiff from the store.[63] Drevar states that he spoke to Lee Veillon, a human resources

---

[55] R. Doc. 13-4 at 6, ¶22 (Declaration of Edward W. Drevar).
[56] R. Doc. 13-4 at 7, ¶24 (Declaration of Edward W. Drevar).
[57] R. Doc. 13-4 at 7, ¶25 (Declaration of Edward W. Drevar).
[58] R. Doc. 13-4 at 7, ¶26 (Declaration of Edward W. Drevar).
[59] R. Doc. 13-4 at 7–8, ¶¶28–29 (Declaration of Edward W. Drevar).
[60] R. Doc. 13-4 at 7–8, ¶28 (Declaration of Edward W. Drevar).
[61] R. Doc. 13-4 at 7–8, ¶28 (Declaration of Edward W. Drevar).
[62] R. Doc. 13-4 at 8, ¶29 (Declaration of Edward W. Drevar).
[63] R. Doc. 13-4 at 7–8, ¶28 (Declaration of Edward W. Drevar).

generalist employed at Rouses's headquarters in Thibodeaux, Louisiana, on Monday, September 15, 2014.[64] According to Drevar, it was during that conversation when he was informed the Plaintiff's employment would be terminated and that he needed to relay the news to Plaintiff.[65] Drevar states that, after consulting with Veillon, he called Plaintiff on the morning of September 15th and informed him that he was being terminated "due to a lack of confidence."[66] Drevar notes that he did not "accuse Mr. White of committing theft, and [Drevar] did not ask if he committed theft."[67]

Plaintiff argues Drevar "fabricated" the theft allegations in order to get Plaintiff fired and to "protect himself."[68] Plaintiff argues, specifically, that Drevar "fabricated a story about seeing a buggy full of bagged meat and seafood in a cooler at the store," which is merely a "far-fetched" factual scenario created by Drevar to distract this Court from the true story behind Plaintiff's suspension and eventual termination. Plaintiff also argues that Veillon, the human resources employee who made the decision to fire Plaintiff, relied on Drevar's fabricated theft allegations in making the decision.[69] According to Plaintiff, he was an "honest" and "loyal" employee of Rouses for two-and-a-half years and Rouses's "story" that he stole groceries makes little sense.[70] Plaintiff maintains neither Drevar nor Guidroz saw Plaintiff exit the store with unpaid-for groceries.[71] According to Plaintiff, "[i]t seems more plausible that a gay manager wrongly played his cards with a subordinate

---

[64] R. Doc. 13-4 at 9, ¶33 (Declaration of Edward W. Drevar).
[65] R. Doc. 13-4 at 9, ¶33 (Declaration of Edward W. Drevar).
[66] R. Doc. 13-4 at 9, ¶33 (Declaration of Edward W. Drevar).
[67] R. Doc. 13-4 at 9, ¶33 (Declaration of Edward W. Drevar).
[68] R. Doc. 15 at 3.
[69] R. Doc. 15-1 at 3.
[70] R. Doc. 15 at 4–5.
[71] R. Doc. 15 at 4.

employee and, having realized his gross miscalculation, tried to get that employee fired by filing a false report."[72]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[73] "An issue is material if its resolution could affect the outcome of the action."[74] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[75] All reasonable inferences are drawn in favor of the non-moving party.[76] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law.[77]

If the dispositive issue is one on which the moving party will bear the burden of persuasion at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[78] If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the non-moving party to direct the Court's attention to something in the pleadings or other evidence in the

---

[72] R. Doc. 15 at 5.
[73] FED. R. CIV. P. 56. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[74] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[75] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[76] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[77] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).
[78] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).

record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[79]

If the dispositive issue is one on which the non-moving party will bear the burden of persuasion at trial, as in this case, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the non-movant's claim, or (2) affirmatively demonstrating that there is no evidence in the record to establish an essential element of the non-movant's claim.[80] If the movant fails to affirmatively show the absence of evidence in the record, its motion for summary judgment must be denied.[81] Thus, the non-moving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[82] "[U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[83]

---

[79] *Celotex*, 477 U.S. at 322–24.

[80] *Id.* at 331–32 (Brennan, J., dissenting).

[81] *See id.* at 332.

[82] *Id.* at 332–33. The burden would then shift back to the movant to demonstrate the inadequacy of the evidence relied upon by the non-movant. Once attacked, "the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Id.* at 332–33, 333 n.3.

[83] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

## LAW AND ANALYSIS

Plaintiff's claims in this action are two-fold. First, Plaintiff argues he was sexually harassed by Edward Drevar, the store director of the Rouses Supermarket where Plaintiff worked, in violation of Title VII of the Civil Rights Act of 1964.[84] Because both Plaintiff and Drevar are male, Plaintiff's sexual harassment claim is a same-sex sexual harassment claim under Title VII. Second, Plaintiff contends he was unlawfully retaliated against for refusing Drevar's "sexual advances," also in violation of Title VII.[85] Rouses seeks summary judgment on both claims. The Court addresses each claim, individually.

I.   SAME-SEX SEXUAL HARASSMENT

Same-sex sexual harassment is actionable under Title VII, but only if the plaintiff-employee can "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discrimination* because of sex."[86] The Fifth Circuit has established a two-step process for evaluating claims of same-sex sexual harassment.[87] First, the employee must demonstrate that the sexual harassment amounted to "discrimination based on sex."[88] The employee can make this showing by: (1) establishing that the harasser made "explicit or implicit proposals of sexual activity and providing credible evidence that the harasser was homosexual;" (2) demonstrating that the harasser was "motivated by general hostility to the presence of members of the same sex in the workplace;" or (3) offering "direct, comparative evidence about how the alleged harasser treated members of box sexes in a mixed-sex workplace."[89] If the court determines that

---

[84] R. Doc. 1 at 2.
[85] R. Doc. 1 at 3.
[86] *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82 (1998) (finding that same-sex sexual harassment is actionable under Title VII) (internal quotation marks and ellipses omitted).
[87] *See, e.g., La Day v. Catalyst Tech., Inc.*, 302 F.3d 474 (5th Cir. 2002).
[88] *Id.* at 478.
[89] *Id.* (internal quotation marks omitted).

any of these conditions is met and that the conduct in question is therefore based on sex, the court may move on to the second part of the analysis, *i.e.*, whether the conduct meets the standards for either quid-pro-quo harassment or a hostile work environment claim.[90] The plaintiff-employee must satisfy both parts of this analysis to have an actionable Title VII same-sex sexual harassment claim.[91]

A. <u>Discrimination Based On Sex</u>

It is clear that Plaintiff is proceeding under the first method of proof. Plaintiff argues that Drevar is homosexual and made "explicit or implicit proposals of sexual activity." It is undisputed that Drevar, the alleged harasser, is a homosexual male. Drevar acknowledged he is homosexual in his deposition, which Rouses does not refute.[92] Whether Drevar made "explicit or implicit proposals of sexual activity," however, is disputed. Plaintiff's deposition testimony is the only competent summary-judgment evidence offered by Plaintiff to show a proposal of sexual activity was made.[93] Plaintiff testified in his deposition that Drevar, while "his pants [were] down and his ass [was] exposed," stated to Plaintiff: "So, how bad do you want that raise?"[94] Plaintiff further testified that Drevar had a "very sadistic look on his face" when the statement was made.[95] In response, Rouses points to Drevar's declaration in which he stated that the alleged encounter never occurred.[96] Furthermore, Rouses argues, even if the statement were made, there is no evidence that the statement "was a solicitation for sexual activity rather

---

[90] *Id.*
[91] *Id.*
[92] R. Doc. 15-3 at 21–22 (Deposition of Edward W. Drevar). *See generally* R. Docs. 13-1, 13-2.
[93] R. Doc. 15-2 (Deposition of Marcus White).
[94] R. Doc. 15-2 at 5 (Deposition of Marcus White).
[95] R. Doc. 15-2 at 5 (Deposition of Marcus White).
[96] R. Doc. 13-4 at 8, ¶30 (Declaration of Edward W. Drevar). Rouses also contends that the Plaintiff cannot demonstrate discrimination based on sex, pointing to the fact that Plaintiff, in his administrative proceedings, argued Drevar made the statement on September 10, 2014, a date on which it is undisputed that Drevar and Plaintiff were not at work together. *See supra* note 13.

than a simple, vague comment (perhaps made at an awkward time), or any other evidence to even suggest that Drevar was propositioning him."[97] Rouses notes that, by Plaintiff's own admission, Drevar had never before sexually propositioned Plaintiff or said anything inappropriate to him.[98] Moreover, Plaintiff testified that, after he rebuked Drevar's alleged proposition, the look on Drevar's face was, "like, oh, shit, not the response I was expecting."[99] Rouses contends this testimony supports a finding that, if Drevar did in fact make the statement, it was not intended as a sexual proposition and, thus, was not discrimination based on sex. The parties have presented conflicting evidence on whether the statement was made by Drevar, and if so, whether the statement amounts to discrimination based on sex. Nevertheless, for purposes of summary judgment, the Court will assume, without deciding, that Plaintiff has established discrimination because of sex and move to the second step of the analysis.

B.  Quid Pro Quo or Hostile Work Environment

If an employee establishes that the alleged harassment was discrimination because of sex, the Court then must decide whether the conduct meets the applicable standards for either a quid pro quo or hostile work environment claim.[100] Whether the employee suffered a "tangible employment action" determines whether the claim is analyzed as a quid pro quo sexual harassment claim or a hostile work environment claim.[101] To establish quid pro quo sexual harassment, for example, the plaintiff-employee must present evidence that he was subject to a "tangible employment action that resulted from

---

[97] R. Doc. 13-2 at 9 (emphasis omitted).
[98] R. Doc. 13-2 at 9 (citing R. Doc. 13-7 at 35, 37 (Deposition of Marcus White)).
[99] R. Doc. 13-7 at 13 (Deposition of Marcus White).
[100] *La Day*, 302 F.3d at 478.
[101] *See Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000); *see also Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 201 (5th Cir. 2007).

his acceptance or rejection of his supervisor's alleged sexual harassment."[102] If the plaintiff-employee did not suffer a tangible employment action, the claim must be analyzed as a hostile work environment claim.[103]

### 1. Quid Pro Quo Sexual Harassment

A "tangible employment action" constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[104] To qualify as quid pro quo sexual harassment, the tangible employment action must have resulted from the plaintiff-employee's "acceptance or rejection of his supervisor's alleged sexual harassment."[105] Therefore, Plaintiff Marcus White must show, not only that he suffered a tangible employment action, as defined above, but also that the action "resulted from his acceptance or rejection of his supervisor's alleged sexual harassment."[106] To survive summary judgment, Plaintiff must demonstrate that a genuine issue of material fact exists with respect to whether he suffered a tangible employment action that resulted from his rejection of Drevar's alleged sexual advances.[107]

In moving for summary judgment, Rouses relies, in part, on a sworn declaration executed by Wade Guidroz, Rouses's assistant store director.[108] According to Guidroz, it was he, not Drevar, who was notified by David Michel, another Rouses's employee, that a shopping cart with bagged groceries had suspiciously been left in the meat cooler.[109]

---

[102] *La Day*, 302 F.3d at 481 (internal quotation marks omitted). *See also Calmes v. JPMorgan Chase Bank*, 943 F. Supp. 2d 666, 678 (E.D. La. 2013).
[103] *Casiano*, 213 F.3d at 283.
[104] *La Day*, 302 F.3d at 481–82 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (internal quotation marks omitted).
[105] *Casiano*, 213 F.3d at 283.
[106] *La Day*, 302 F.3d at 481 (citing *Casiano*, 213 F.3d at 283).
[107] *See Casiano*, 213 F.3d at 284–85; *Russell*, 234 F. App'x at 201–02.
[108] R. Doc. 13-5 (Declaration of Wade M. Guidroz).
[109] R. Doc. 13-5 at 3, ¶3 (Declaration of Wade M. Guidroz). *See also* R. Doc. 13-2 at 3.

Guidroz also notes in his declaration that he, and not Drevar, was the first to be notified that Marcus White was responsible for the misplaced groceries.[110] Other than unsupported argument that the theft allegations are "fabricated," Plaintiff has produced no evidence to contradict Guidroz's declaration. The Court finds Guidroz's declaration, and the lack of contrary evidence, significant. The evidence presented shows that it was not Drevar who initiated, or as Plaintiff argues "fabricated," the theft allegations. Instead, it was Guidroz who first learned of the suspicious, misplaced groceries from David Michel; it was Guidroz who first suspected the involvement of Marcus White; and it was Guidroz who reported the situation to Drevar. It is undisputed that Guidroz knew nothing about Drevar's alleged harassment of Plaintiff, as Plaintiff himself admitted he never reported the incident to anyone at Rouses, neither his superiors nor his co-workers.[111] Without knowledge of Drevar's alleged sexual advances and Plaintiff's rejection thereof, it cannot be seriously argued that Guidroz initiated or fabricated theft allegations against the Plaintiff to aid Drevar in covering up the encounter.

Rouses's also relies on the sworn declaration of Patricia Velez. Velez, a Rouses's bookkeeper, stated in her declaration that she, personally, saw Marcus White exit the store with bagged groceries without stopping to pay for the items.[112] Velez, like Guidroz, ostensibly knew nothing about Drevar's alleged harassment of Plaintiff.[113] Velez's declaration lends credence to Rouses's explanation that Plaintiff was terminated because of suspicion he stole groceries from the store. As with Guidroz's declaration, Plaintiff has not rebutted Velez's declaration with any competent summary judgment evidence.

---

[110] R. Doc. 13-5 at 3, ¶7 (Declaration of Wade M. Guidroz).
[111] R. Doc. 15-1 at 2, ¶7.
[112] R. Doc. 13-6 at 3, ¶¶6–7 (Declaration of Patricia Velez).
[113] R. Doc. 15-1 at 2, ¶7.

Furthermore, Plaintiff has presented no competent summary judgment evidence that Drevar, his alleged harasser, was responsible for the decision to suspend and ultimately fire him. After learning of Plaintiff's suspected involvement in the theft from Guidroz and Velez, two disinterested third parties, and after investigating the incident for himself, Drevar notified Lloyd Songy, a Rouses's district manager, and Randall Howard, the head of security for Rouses's Supermarkets.[114] It was Howard who instructed Drevar to suspend Plaintiff when he reported to work on September 12th,[115] and it was Lee Veillon, a Rouses's human resources generalist, who directed Drevar to inform Plaintiff that he was being terminated on September 15th.[116] As above, Howard and Veillon knew nothing about the allegations of sexual harassment against Drevar, as Plaintiff admits he never reported the incident to anyone at Rouses.[117] Howard and Veillon knew only that Plaintiff was suspected of stealing items from Rouses, and Howard and Veillon decided to suspend and terminate Plaintiff based on that information alone. Other than being the "bearer of bad news," there is no evidence that Drevar had anything to do with making the actual decisions to suspend and then terminate the Plaintiff, and Plaintiff has pointed to no facts or evidence to suggest otherwise. Absent evidence linking Drevar to the decisions made by Howard and Veillon to suspend and terminate him, the Plaintiff cannot show that the actions taken against him "resulted from his acceptance or rejection of his supervisor's alleged sexual harassment."[118]

---

[114] R. Doc. 13-4 at 7, ¶¶24–25 (Declaration of Edward W. Drevar).

[115] R. Doc. 13-4 at 7–8, ¶¶28–29 (Declaration of Edward W. Drevar).

[116] R. Doc. 13-4 at 9, ¶33 (Declaration of Edward W. Drevar).

[117] R. Doc. 15-1 at 2, ¶7.

[118] *See, e.g., Casiano*, 213 F.3d at 284–85 (finding no tangible employment action where an employee was denied access to a training program because another manager, not the harassing supervisor, was responsible for the decision); *Harper v. City of Jackson Mun. Sch. Dist.*, 149 F. App'x 295, 298–300 (5th Cir. 2005) (finding plaintiff failed to make sufficient showing of tangible employment action where she failed to show that her direct supervisor, the alleged harasser, rather than a different supervisor, actually imposed a significant change in employment status); *Hawkins v. Avalon Hotel Grp., Inc.*, 986 F. Supp. 2d

Other than the temporal proximity between Drevar's alleged harassment and Plaintiff's suspension and eventual termination, Plaintiff has pointed to no competent summary judgment evidence that causally links the employment actions taken against him to his encounter with Drevar. Though temporal proximity can be relevant to establish proof of causation in the context of quid pro quo sexual harassment claims,[119] when viewed in light of the entire record in this case—specifically, (1) the lack of any other evidence linking Drevar's alleged harassment to Plaintiff's termination, and (2) the presence of competent evidence connecting Plaintiff's termination to the suspected theft—Plaintiff has failed to establish the presence of a genuine factual dispute with respect to causation.[120] In *Frensley v. North Mississippi Medical Center, Inc.*, the Fifth Circuit upheld the district court's grant of summary judgment on similar facts.[121] The district court in *Frensley* granted summary judgment to the defendant-employer, finding that the plaintiff-employee failed to establish a causal connection between her supervisor's alleged sexual harassment and the elimination of her position.[122] A few weeks

---

711, 722–23 (M.D. La. 2013) ("The record is clear that the decision to terminate Plaintiff was in response to her failure to show for work without calling in to management . . . . Plaintiff has presented no summary judgment evidence to controvert the evidence which supports this fact other than her own speculation and conclusory allegations."); *Calmes*, 943 F. Supp. 2d at 679–80 ("Without some evidence that it was Mr. Ritchel's decision to suspend Plaintiff, there is no evidence of a causal connection between Plaintiff's suspension and the actual harassment, *i.e.* there is no evidence that an action was taken as a result of 'acceptance of rejection of his supervisor's alleged sexual harassment.'"); *Moss v. Wal-Mart Stores, Inc.*, No. 04-3090, 2007 WL 846530, at *8 (E.D. La. Mar. 19, 2007) (holding there was no tangible employment action where the person making the decision to take the action in question was someone other than the alleged harasser).

[119] *See, e.g., Frensley v. North Miss. Med. Ctr.*, 440 F. App'x 383, 387 (5th Cir. 2011) ("In *Russell v. University of Texas of the Permian Basin*, we stated that '[t]hough we have often held that evidence of close temporal proximity can serve as proof of causation for retaliation claims, *see, e.g., Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001), we have never used such evidence as proof of causation for quid pro quo claims. Some of our sister circuits have accepted temporal proximity as proof of causation in quid pro quo cases, but we need not reach this issue in this instance.' We agree with our sister circuits that temporal proximity evidence can be considered along with other circumstances in deciding causation. And considering the temporal proximity . . . along with other evidence in this case, we conclude that evidence does not raise a genuine issue of material fact as to causation.").

[120] *See id.* at 386–87.

[121] *See id.* at 388.

[122] *Id.* at 386–87.

before the plaintiff-employee's position was eliminated, her supervisor invited her to his home for drinks.[123] The plaintiff-employee rejected the invitation and, approximately five weeks later, was notified by her supervisor that her position was being eliminated.[124] The district court assumed without deciding that the supervisor's invitation amounted to sexual harassment.[125] Shifting to the quid-pro-quo prong of the analysis, the district court noted that the evidence of a causal connection was based "almost exclusively" on (1) the temporal proximity of the plaintiff-employee's rejection of her supervisor's alleged harassment and the elimination her position, and (2) the plaintiff-employee's "subjective belief that the two events were related."[126] The district court held, and the Fifth Circuit agreed, that such evidence was insufficient to raise a genuine issue of material fact as to the reason for the elimination of the plaintiff-employee's position, especially in light of competent summary judgment evidence supporting an alternative, legitimate reason for eliminating her position.[127] In this case, as in *Frensley*, the alleged harassment occurred in close temporal proximity to Plaintiff's termination, but the only other evidence the Plaintiff has offered to establish a causal connection is his own subjective deposition testimony that the events were related.

The Plaintiff has not satisfied his summary judgment burden by calling the Court's attention to evidence already in the record that was overlooked or ignored by Rouses. As a result, the Plaintiff has not demonstrated the existence of a genuine factual dispute as to whether his firing "*resulted*" from his rejecting Drevar's alleged sexual advances. The competent, unrebutted evidence submitted by Rouses shows that Plaintiff's termination

---

[123] *Id.* at 386.
[124] *Id.* at 384−86.
[125] *Id.* at 386−87.
[126] *Id.* at 387.
[127] *Id.* at 386−88.

did not stem from his encounter with Drevar. The summary judgment evidence shows, instead, that the Plaintiff was terminated for a lack of confidence because he was suspected of stealing from Rouses, not because he rejected Drevar's alleged sexual advances.[128]

### 2. Hostile Work Environment

The Court now considers whether Plaintiff can establish that factual disputes exist with respect to whether he suffered same-sex sexual harassment and a hostile work environment. To prevail on a hostile work environment claim, the Plaintiff must establish that: (1) he belongs to a protected group; (2) he was subjected to unwelcome sexual harassment; (3) the harassment complained of was because of sex; and (4) the harassment affected a term, condition, or privilege of employment.[129]

"Sexual harassment affects a term, condition, or privilege of employment when it is '*severe* or *pervasive*.'"[130] The Plaintiff must show that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[131] To determine whether an environment is sufficiently hostile or abusive, courts must look at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[132] "Simple teasing, offhand comments,

---

[128] *See* R. Docs. 13-4 (Declaration of Edward W. Drevar); 13-5 (Declaration of Wade M. Guidroz); 13-6 (Declaration of Patricia Velez); *see also* R. Doc. 13-3 (Deposition of Edward W. Drevar).
[129] *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).
[130] *Russell*, 234 F. App'x at 205 (emphasis added) (quoting *La Day*, 302 F.3d at 482).
[131] *La Day*, 302 F.3d at 482 (internal quotation marks omitted) (quoting *Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 269 (5th Cir. 1998)).
[132] *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). *See also Calmes*, 943 F. Supp. 2d at 680.

and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[133]

In this case, it is clear from Plaintiff's deposition that he found Drevar's conduct to be subjectively offensive.[134] Therefore, the question before the Court is whether Drevar's conduct was also objectively offensive. The Court finds, as a matter of law, that it was not. Plaintiff's sole allegation of harassment against Drevar is that, in an isolated incident, Drevar stated to Plaintiff: "So, how bad do you want that raise?"[135] The statement was allegedly made while Drevar and Plaintiff were both in the employee's restroom, and Plaintiff contends that, in connection with the statement, Drevar "had his pants down looking back at me with, like, a very sadistic look on his face."[136] Plaintiff further alleges Drevar's "ass [was] exposed" when he made the statement.[137] Plaintiff admittedly got "very angry" and told Drevar, "I didn't know I had to do sexual favors in order to get a raise that's rightfully mine."[138] Plaintiff then left the restroom, and the encounter ended.

In *Love v. Motiva Enterprises, LLC*, the Fifth Circuit affirmed the district court's grant of summary judgment on the basis that the alleged harassment was not severe or pervasive.[139] In that case, the plaintiff presented proof of at least twenty-four incidents of alleged sexual harassment, yet the court found that the harassment was not pervasive.[140] Furthermore, the court found the alleged conduct was not severe when "the harasser did

---

[133] *Id.* at 788 (internal quotation marks omitted).
[134] *See generally* R. Doc. 15-2.
[135] R. Doc. 15-2 at 5 (Deposition of Marcus White).
[136] R. Doc. 15-2 at 5 (Deposition of Marcus White).
[137] R. Doc. 15-2 at 5 (Deposition of Marcus White).
[138] R. Doc. 15-2 at 5–6 (Deposition of Marcus White).
[139] 349 F. App'x 900, 902 (5th Cir. 2009).
[140] *Id.* at 902–03.

not actually touch the plaintiff's private parts of make direct requests for sexual conduct."[141] As the district court in *Love* explained:

> Fifth Circuit precedent in the realm of sexual harassment claims has generally upheld summary judgment even on facts more egregious than those of the instant case. For example, in *Russell v. University of Texas of Permian Basin*, the appellate court upheld summary judgment of a same-sex sexual harassment claim under a hostile work environment theory based on lack of severity and pervasiveness when the female defendant had rubbed the inside of the female plaintiff's hand and thigh; twice intimated that she wanted to move to New York with plaintiff; stated that she would like to watch a movie in bed with plaintiff; and called plaintiff "honey" or "babe." 234 F. App'x 195, 205 (5th Cir. 2007). The court based its holding on a comparison of the types of behavior at issue in *Russell* with those in *Hockman v. Westward Communications, LLC*, an opposite-sex sexual harassment claim under a hostile work environment theory. *Russell*, 234 F. App'x at 205 (citing *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 327–28 (5th Cir. 2004)). In *Hockman*, the Fifth Circuit held as a matter of law that plaintiff could not establish a hostile work environment claim based on the fact that the male defendant had commented about another female employee's body, slapped plaintiff's buttocks with a newspaper, grabbed or brushed against her breast and buttocks, and attempted to kiss her once. *Hockman*, 407 F.3d at 328. The *Russell* Court held that the alleged harassment by the female defendant against the female plaintiff were "on the same plane as those . . . found insufficient to establish 'severe or pervasive' harassment in *Hockman*." *Russell*, 234 F. App'x at 205.[142]

The allegations of sexual harassment in this case are nowhere near as severe or pervasive as those in *Russell* or *Love*. As a result, the Court finds, as a matter of law, that the Plaintiff has failed to establish a claim for same-sex sexual harassment based on a hostile work environment theory.[143] Moreover, as an additional matter, the Court notes that Plaintiff, in his opposition, altogether failed to rebut, let alone even address, Rouses's

---

[141] *Calmes*, 943 F. Supp. 2d at 681 (citing *Love v. Motiva Enters., LLC*, No. 07-5970, 2008 WL 4286662, at *8 (E.D. La. Sept. 17, 2008)).

[142] *Love*, 2008 WL 4286662, at *8.

[143] Having concluded that the alleged sexual harassment in this case was not severe or pervasive, the Court need not address Rouses's invocation of the *Ellerth/Faragher* affirmative defense, as it only applies if the alleged conduct was severe or pervasive. *See, e.g., Hughes v. Texas Steakhouse & Bar, Inc.*, No. 3:05-CV-0061-M, 2006 WL 708158, at *2 (N.D. Tex. Mar. 21, 2006); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

arguments for summary judgment on Plaintiff's same-sex sexual harassment claim to the extent the claim was based on a hostile work environment theory.[144] There are no genuine factual disputes in the record, and the Court finds as a matter of law that Plaintiff was not subjected to a hostile work environment.

## II.   RETALIATION

Title VII retaliation claims are analyzed under a modified *McDonnell Douglas* burden-shifting approach.[145] Under this approach, if the plaintiff demonstrates a *prima facie* case of retaliation, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for its decision to terminate the plaintiff.[146] If such a showing is made, the burden shifts back to the plaintiff to establish that the employer's proffered reason is a "pretext for the actual retaliatory reason."[147]

The Court will assume, without deciding, for purposes of summary judgment, that the Plaintiff has stated a *prima facie* case of retaliation under Title VII. Moving to the next step in the burden-shifting analysis, the Court finds Rouses has articulated a legitimate, non-retaliatory reason for its decision to terminate the Plaintiff—*i.e.*, Plaintiff's alleged theft of bagged groceries and other items from the Rouses store at which he was employed. Rouses has come forward with ample summary-judgment evidence in the form of sworn declarations in support of its proffered reasons for Plaintiff's termination. Attached to Rouses's motion for summary judgment are valid declarations from Rouses employees Wade Guidroz, Patricia Velez, and Edward Drevar, all of whom attest at length to the fact that Plaintiff was suspected of stealing from Rouses, and that Plaintiff's

---

[144] *See generally* R. Docs. 15, 15-1; *see infra* note 150.
[145] *See, e.g.*, *Richardson v. Monitronics International*, 434 F.3d 327, 332–33 (5th Cir. 2005).
[146] *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007)).
[147] *Id.*

suspected theft led to his termination by Rouses officials.[148] Rouses has also produced the deposition testimony of Edward Drevar, which lends further support to the non-retaliatory reason cited by Rouses as justifying Plaintiff's termination.[149]

Because Rouses has come forward with evidence of a legitimate, non-retaliatory reason for Plaintiff's termination, the burden shifts back to the Plaintiff to establish that the reason proffered by Rouses is merely a pretext for the actual, retaliatory reason. Plaintiff has not met this burden. Other than his own deposition testimony, Plaintiff has not come forward with any competent summary-judgment evidence to contradict or disprove the legitimate, non-retaliatory reason offered by Rouses, *i.e.*, that Plaintiff was suspended and eventually terminated because he was suspected of stealing from Rouses. Instead, Plaintiff relies solely on his own subjective deposition testimony to establish a causal connection between his termination and his refusal of Drevar's alleged sexual advances. Such argument, without evidentiary support, is not sufficient to withstand summary judgment.[150]

Moreover, the Court notes that Plaintiff, in his opposition, failed to specifically address Rouses's summary-judgment arguments as to why his retaliation claim should be dismissed. As a result, the Court finds that Plaintiff failed to adequately brief his

---

[148] *See* R. Docs. 13-4 (Declaration of Edward W. Drevar); 13-5 (Declaration of Wade M. Guidroz); 13-6 (Declaration of Patricia Velez).

[149] R. Doc. 13-3 (Deposition of Edward W. Drevar).

[150] *See, e.g., Kennerson v. Guidry*, 135 F. App'x 639, 641–42 (5th Cir. 2005) ("[B]ecause Kennerson offers no summary judgment evidence to substantiate his subjective belief that his termination was due to . . . retaliation, he is unable to raise a genuine issue of material fact as too whether the Appellees' proferred legitimate non-discriminatory reason for the termination decision was pretext."); *Comans v. Scott Cnty. Sch. Dist.*, No. 3:06CV505-HTW-LRA, 2010 WL 1780205, at *7 (S.D. Miss. Apr. 30, 2010) (citing *Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 266 (5th Cir. 1997)) ("And, subjective beliefs are insufficient to create a genuine issue of material fact on a retaliation claim.").

retaliation claim in response to Rouses's motion for summary judgment, which serves as another ground upon which the Court's decision is based.[151]

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Rouses's motion for summary judgment be and hereby is **GRANTED**,[152] and Plaintiffs' claims are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Rouses's motion *in limine* to exclude Plaintiff's evidence and witnesses not timely disclosed be and hereby is **DENIED AS MOOT**.[153]

**New Orleans, Louisiana, this 3rd day of June, 2016.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[151] *Knudsen v. Bd. of Supervisors of Univ. of La. Sys.*, No. 14-382, 2015 WL 1757695, at *1 (E.D. La. Apr. 16, 2015) ("A party's failure to brief an argument in response to a summary judgment motion waives that argument."); *see also Williamson v. Watco Cos., Inc.*, No. 09-1255, 2010 WL 4117745, at *3 (W.D. La. Oct. 13, 2010) ("failure to brief an argument in the district court waives that argument in that court"); *Hervey v. Miss. Dep't of Educ.*, No. 3:08cv180–DPJ–JCS, 2010 WL 88901, at *7 (S.D. Miss. Jan. 6, 2010); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653, 658 n.9 (S.D. Tex. 2008) (claim waived where party failed to brief the claim or assert the claim either directly or in response to employer's motion for summary judgment); *Hill v. Sodexho Servs. of Tex., L.P.*, No. A–05–CA–732–LY, 2007 WL 4234261, at *2 n.1 (W.D. Tex. 2007) (finding that the plaintiff waived claims he failed to brief in his response to a motion for summary judgment) (citing *Whitmire v. Terex Telelect, Inc.*, 390 F. Supp. 2d 540, 548 (E.D. Tex. 2005) (the plaintiff waived his claims when he did not raise or brief issues related to those claims in his response to motion for summary judgment)).
[152] R. Doc. 13
[153] R. Doc. 23.